THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
KENNETH PARHAM, Defendant-Appellant.

First District (3rd Division)   No. 84—0347

———

Opinion filed February 19, 1986.

Steven Clark and Paul Alexander Rogers, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Gustavo Munoz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant was found guilty of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)) and sentenced to 30 years in the penitentiary. In this appeal from that judgment, defendant contends that the trial court erred in admitting his written statement into evidence since it had been obtained in violation of his fifth amendment right to counsel; and secondly, that the evidence was insufficient to prove that he was legally sane beyond a reasonable doubt.

The charges against defendant stemmed from an incident which occurred in the early morning hours of June 19, 1978. At that time, defendant hit his three-month old nephew on the head with an aerosol can, then threw him on the floor several times; the infant sustained multiple fractures to the skull and died as a result.

Several hours after the incident, defendant gave a court-reported statement admitting the acts which led to the death of the victim. He was subsequently indicted for the murder but then determined to be unfit to stand trial and in need of mental treatment. Defendant was remanded to the Department of Mental Health, and reports of his condition were filed with the court over the ensuing years. After a restoration hearing on January 19, 1983, defendant was found fit to stand trial, and trial commenced the following September. In his opening statement, defense counsel informed the court that the facts which resulted in the death of the infant would not be disputed, and that the defense would rely on the State's inability to disprove defendant's insanity beyond a reasonable doubt.

Alfreda Parham, the mother of the victim and sister of defendant, testified that on June 18, 1978, she and the victim resided with

defendant and their mother at 8851 South Aberdeen Street in Chicago. On that night Mrs. Parham left the residence about 11:30 p.m., and Alfreda cleaned her room while her baby slept on the couch. Defendant wanted to play with the baby, but she told him to leave the child alone. Later that evening defendant disregarded her admonition and took the baby upstairs. When she questioned his action, defendant hit her on the face with his fist, then brought the baby downstairs, threw him on the couch and started chasing his sister around the dining room table. When he was unable to catch her, he told her to come over and threatened to hurt the baby if she did not. She walked into the living room but defendant told her that she was too slow, then took a can of hair spray and struck the baby's forehead with it. They started fighting and defendant threw her to the floor and across a table. He then picked up the baby and threw him onto the floor several times. Alfreda started screaming and told him not to hurt the baby because he is "your own blood." With that, his rage diminished and she was able to pick up the baby and seek help from a neighbor.

Alfreda also stated that prior to the incident she observed defendant knocking on doors and windows, and saw him talking to himself. After the incident, she told police that she had told defendant to leave the baby alone, but that he kept shaking and touching him; at trial, however, she did not remember making these remarks.

The State then introduced defendant's court-reported statement which was taken about 6 a.m. on the morning following the incident. In it, he related basically the same series of events leading to the death which were stated by his sister. He admitted that when he started playing with the sleeping baby, his sister told him to leave the child alone, but when she went into her room, he took the baby upstairs. His sister was angry with him for waking the baby, and when she tried to take the baby away from him, he chased her around the table then threw a can of hair spray at the child. When his sister came after him, he picked up the baby and threw him onto the floor several times. He stated that he knew what he was doing at the time, but was angry at his sister and just got carried away.

This statement and the other State exhibits were admitted into evidence without objection, and the State rested its case in chief. The defense then presented the testimony of Dr. Albert Stipes, a forensic psychiatrist employed by the Psychiatric Institute of the circuit court of Cook County, who had examined defendant on August 8, 1983. In his opinion defendant was suffering from schizophrenia, paranoid type, at the time of the offense, and because of this disease lacked the

substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of law.

Prior to his examination of the defendant, Dr. Stipes reviewed defendant's records from the Psychiatric Institute and the medical reports from the Department of Mental Health facilities which contained previous diagnoses of defendant's condition and the record of his hospitalizations. These reports showed that during the period from 1975 until the present defendant was diagnosed as a schizophrenic, and had been found legally insane and unfit for trial. In formulating his opinion Dr. Stipes also considered the information contained in defendant's statement to the police and that provided by members of defendant's family in interviews with social workers. The most recent interview with defendant's sister was held in July 1983, and at that time she told the social worker that on the night of the incident, defendant said that the child was the devil and asked if she saw the scales on him. She also stated that defendant recited Bible verses. Dr. Stipes acknowledged that he had seen defendant only once for a one-hour period, five years after the incident.

Defendant's mother testified that she left the residence about 10:30 p.m. on the night of the occurrence, but earlier in the evening had noticed that defendant was restless and talking to himself. She could not understand what he was saying and tried not to call any attention to his behavior. She had observed him do these things on prior occasions but had never seen him do any real violence, although she did qualify that by relating that defendant had awakened her in the middle of the night on three different occasions in 1975 and stood over her with a knife. She said this behavior started after he had been discharged from the army because of drug problems, and he was eventually admitted to the Tinley Park Mental Health Facility for treatment. She had never seen him show any hostility towards his nephew or any other children.

The defense rested and the State called Detective Harold Huffman in rebuttal. He stated that he was assigned to investigate the case about 2:30 a.m. on June 19, 1978, and interviewed defendant's sister at the police station later that afternoon. At that time, she stated that she had told defendant to leave the baby alone but that he kept shaking the baby and touching him. He also interviewed the defendant and after he waived his constitutional rights, Huffman asked him about the incident. Defendant answered his questions responsively without any noticeable speech problems. When defendant gave his court-reported statement, Huffman did not notice any unusual behavior. He further stated that defendant did not appear to be

under the influence of alcohol or any other type of intoxicant.

The State then presented the testimony of its expert witness, Dr. Kaplan, who was also employed as a psychiatrist with the Psychiatric Institute of the circuit court of Cook County. Dr. Kaplan first examined defendant about 40 days after the incident and had seen him on nine separate occasions since that time. On November 6, 1979, after his sixth visit with defendant, and after he had considered the police reports concerning the incident, the statement made by defendant shortly after it occurred, the social service histories taken from defendant's parents and sister, defendant's hospital records, and his five previous examinations of defendant, Dr. Kaplan concluded that defendant did not lack the substantial capacity to appreciate the criminality of his conduct on the date of the crime and was able to conform his conduct to the requirements of law.

Dr. Kaplan also interviewed defendant on July 15, 1983, and prior to the interview observed defendant interacting with other inmates in the waiting room in a very relaxed manner. He reviewed the above-cited material, and noted that Alfreda Parham's most recent interview with the social worker contained defendant's references to the devil and his reading the Bible at the time of the homicide which were not included in the interview taken four days after the incident; because of the inconsistencies, Dr. Kaplan did not place much credence in the latest report.

During cross-examination, Dr. Kaplan acknowledged that although there were no references to the Bible or the devil in the original social service report, there were references to defendant hearing voices, becoming hostile and delusional and speaking in foreign tongues. There were also references to defendant pacing the floor all night, consuming a full bottle of medication so he would not have to take it at prescribed times, and an incident which occurred about three years before the homicide, when he had become so hostile that he had to be placed in restraints. Dr. Kaplan also acknowledged that defendant had continuously been diagnosed as schizophrenic, and that from 1975 until the date of the incident, defendant was intermittently given medication to treat or control his schizophrenia. although the history was unclear as to whether defendant was taking the medication at the time of the incident, defendant had told Dr. Kaplan that he was not using it on a regular basis at the time of the crime. Dr. Kaplan also stated that he found defendant legally sane on November 6, 1979, but that 45 days later he found some deterioration in his mental ability to stand trial and therefore unfit and in need of mental treatment; this situation continued for two years.

Dr. Kaplan further testified that at the interview he had with the defendant on October 3, 1978, defendant told him that he hit the baby because he was angry with his sister and that he vented his anger on the baby by repeatedly throwing him onto the floor. He also found aspects of defendant's personality to be "social pathological" in that he showed a lack of concern for other people and was very self-centered.

Based on the evidence, the trial court found that the State had proved defendant guilty of the offense beyond a reasonable doubt, and that he was legally sane at the time of the killing. Following a hearing at which defendant's fitness to be sentenced was ascertained, defendant was sentenced to 30 years' imprisonment.

Defendant now appeals from this judgment, contending first that he is entitled to a new trial because the trial court erred in admitting his written statement into evidence when it clearly had been obtained in violation of his fifth amendment right to have counsel present during interrogation. In support of that contention, defendant refers us to that portion of his interview with the assistant State's Attorney in which he asked for a lawyer. While advising defendant of his constitutional rights, the assistant State's Attorney asked:

"Q. Do you understand that if you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you want one?

A. I want a lawyer.

Q. I'm sorry?

A. I want a lawyer. I cannot afford to hire one.

Q. Do you wish to have a lawyer before you make this statement or are you willing to make this statement now without the benefit of a lawyer?

A. I will make a statement.

Q. Do you understand each of these rights that I have explained to you?

A. Yes.

Q. Understanding everything I have said to you, do you now wish to talk to me about what happened tonight?

A. Can I speak to my lawyer first? Okay, I will make a statement now. You want me to explain on the conditions that happened?"

Defendant argues that the holdings of the United States Supreme Court in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, and *Smith v. Illinois* (1984), 469 U.S. ___, 83 L. Ed. 2d 488, 105 S. Ct. 490, have established a *per se* rule that once

an accused has made a clear request for counsel, all questioning must cease until counsel has been made available or he initiates further conversation with the police.

Defendant concedes that this issue was not raised in the trial court, but urges us to consider the issue on review since defense counsel's failure to bring the issue to the attention of the trial court constituted ineffective assistance of counsel, or, in the alternative, plain error. The State responds that if defendant's confession was taken in violation of his fifth amendment right, its admission into evidence was harmless error beyond a reasonable doubt, and also that defendant has waived consideration of this issue on appeal since he failed to raise it in the trial court.

The record shows that defendant did not file a pretrial motion to suppress his confession and its legality was not challenged at trial in any manner. In addition, the statement was admitted into evidence without objection, and appellate counsel concedes that, although trial counsel alleged in his post-trial motion that he was incompetent for failing to object to the statement, this allegation rested upon defendant's incompetence to waive his rights rather than on the grounds now asserted on appeal.

■■ Generally, the failure to raise an issue in a written motion for a new trial constitutes a waiver of that issue which cannot be urged as a ground for reversal upon review. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227.) The waiver rule applies to constitutional as well as all other issues. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) An exception to the general waiver principle, however, is provided by Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)), whereby a reviewing court may consider errors not properly preserved for review if the evidence is closely balanced or the error was of such magnitude that defendant was denied a fair trial. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.) We believe that the admission into evidence of defendant's statement denied him a fair trial.

■■ We agree with the defendant that the fifth amendment violation is apparent from the colloquy set forth above. While it is true that not every Federal constitutional error calls for reversal, to be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt; that is, the complained-of error must not have contributed to the verdict obtained. (*Chapman v. California* (1967), 386 U.S. 18, 23-24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827-28; *People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378.) Here, however, the trial court considered defendant's statement in reaching its conclusion that defendant was legally sane at the time

of the killing.

In making its finding of defendant's guilt the court stated:

"I base this on the testimony of the people who were there that night, the eyewitness, those people were the sister of the defendant. I believe she testified truthfully. I based it also on the evaluation of the psychiatrist, *but I put weight on the testimony of defendant given in court through the court reporter statement introduced. This was a few hours later. He knew the detail, he corrected himself as to detail, he knew certain detail, and I firmly believe after reading that statement, taken with all the other evidence, the defendant was really sane at that time.*" (Emphasis added.)

It is apparent from the record that the defendant's improperly obtained statement contributed to the court's finding of guilt. The admission of the statement, therefore, cannot be considered harmless error. Defendant's conviction must be reversed and the cause remanded for a new trial. Our disposition of this issue makes it unnecessary for us to consider defendant's other contention on appeal.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Reversed and remanded.

McNAMARA and WHITE, JJ., concur.