Olivia D. CLEMONS, Appellant,

v.

The STATE of Texas, Appellee.

No. 58993.

Court of Criminal Appeals of Texas, Panel No. 3.

July 16, 1980.

Rehearing Denied Oct. 22, 1980.

Stephen M. Orr, Austin, for appellant.

Ronald Earle, Dist. Atty., Bill White and Ralph B. Graham, Asst. Dist. Attys., Austin, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of aggravated robbery wherein the jury assessment punishment at confinement in the Texas Department of Corrections for twenty–five years.

Though appellant advances six grounds of error for our consideration, we need not reach each of these contentions. In her first ground of error complaint is made that the trial court erred in failing to grant her motion to suppress certain evidence obtained as a result of an illegal search and seizure. We will sustain that ground of error and have concluded that this evidence was prejudicial in regard to the punishment assessed notwithstanding that its erroneous admission may have been harmless at the guilt–innocence stage of the trial. Accordingly, we now reverse the judgment below.

Les Elich, a concessionaire with the Austin Municipal Auditorium testified that on the afternoon of February 5, 1976 three persons entered his office seeking employment. Elich told the three, one of whom he later identified as appellant, to return at a later time to fill out employment applications though he did not have any vacancies available at that time. The trio asked Elich if he would be interested in purchasing some jewelry and, after he indicated he did not want to purchase any, they left.

At approximately 6:15 that same evening, the same three persons returned; Elich recounted that he looked up from his desk and found himself "looking into a shotgun," which he noted was of the sawed–off variety.[1] The male, appellant's husband Robert, held the shotgun to his head, told Elich to open his safe and, when he balked at doing so, the assailant informed him that unless he opened the safe, he would kill him. Elich noted that during this episode appellant also displayed a weapon, which he identified as a chrome–plated pistol. The third person, one Brenda Lewis, also exhibited a

---

1. Elich stated that the shotgun introduced by the State [Exhibit 21] was either one and the same or very similar to the one placed at his head because both weapons had broken stocks and were of the same size.

pistol. After Elich opened the safe and removed its contents, appellant ordered him to lie down near the safe and, as he was complying with the request, appellant struck him in the mouth. Elich then heard Robert Clemons instruct appellant to kill him, and he positively identified appellant as one who fired her weapon at him, striking him in the back. The complainant pleaded with his assailants not to shoot him again; he feigned being dead to avoid being shot again. The trio took Elich's watch and ring and, after they left, Elich called the police. Appellant and Clemons fled to Kansas City and their later arrest in a fortuitous incident there gives rise to her present grievance.

Complaint is made that the trial court erred in failing to suppress certain evidence seized during the course of a warrantless search of a motel room at the time of her arrest.[2] At a pretrial hearing on the motion, Officer Arnold Rider of the Kansas City Police Department testified that around 8:00 p. m., February 20, 1976, he and two fellow officers were dispatched to the Travel Lodge Motel at the behest of their superior, Sergeant Finlay. Finlay had received an anonymous telephone call advising him that two undescribed individuals in Room 312 of the Travel Lodge Motel were armed with shotguns and had allegedly committed several robberies. Upon arriving at the motel, the officers were informed that the management had already requested police aid to investigate a disturbance by occupants of Room 312. Rider, two other officers and David Staffer, an off–duty Kansas City police officer working in uniform as a security officer for the motel, proceeded to Room 312 where they could hear loud noises and laughter coming from the room. Officer Staffer knocked on the door and, upon receiving an oral reaction, identified himself as motel management who had reports of a disturbance in the room and wanted to talk about that. The door was opened by a male, later identified as Robert Clemons, who was again told of the reports of a disturbance from 312 and asked by Officer Staffer if the officers might step into the room. It was established that Officer Rider was brandishing a .12 gauge shotgun and, though each officer was armed with a service revolver, it is unclear whether the other officers had their own weapons in hand. Staffer testified that after hesitating for a moment,[3] the male stated that the officers "might as well get out of the hallway," and stepped back and aside to let them into the motel room.[4] Officer Rider led the way.

Once in the room, Rider observed appellant lying on the bed clad in pants and a brassiere. He told Robert that the disturbance complaint was "of relatively minor consequence," that the "main thing" was the officers had received information that the occupants of the room were armed with a sawed–off shotgun; Robert Clemons denied having any knowledge of that. Meanwhile appellant began backing up towards a suitcase to put a blouse on. Rider testified that at that juncture he became fearful that appellant was attempting to obtain a shotgun from the open suitcase and that, feeling that he and the other officers were in danger, ordered appellant to halt. The officer then moved around the suitcase and discovered a silver–colored revolver inside, which he believed to be loaded.[5]

After Robert and Olivia Clemons complied with the officer's request to produce some identification, Officer Meadows called

---

2. *Inter alia*, the written motion to suppress alleged a wrongful arrest because without probable cause or legal process and "there was no search warrant of any kind."

3. Both on hearing and at trial Officer Rider made it clear that the precise sequence was the request to enter by Officer Staffer, hesitation by the male, stepping into "full view" by Officer Rider with his shotgun and, finally, the response.

4. Before the jury Officer Rider related, "There was some conversation that took place between Officer Staffer and the party, and then I stepped into full view."

5. Officer Rider conceded that possession of a pistol in a motel room is not an unlawful act in Kansas City. Of course, its presence there was a cause for justifiable concern for personal safety on the part of the officers.

police headquarters via walkie–talkie for a check with the Kansas City crime computer to determine if the subjects had local records or outstanding warrants. This inquiry revealed that neither Robert nor Olivia Clemons were "wanted" in Kansas City for any type of offense or the like. A second inquiry to the National Crime Information Center (NCIC) revealed, however, that Robert Clemons was indeed wanted in connection with a robbery outside of the Kansas City area. As Rider moved the subjects toward the door, and away from the weapon that had already been discovered, he saw a sawed–off shotgun under a nearby bedspread. The officer formed the opinion that the shotgun was an illegal weapon under the purview of both Missouri and federal statutes, and he advised Robert and Olivia that they were going to police headquarters for investigation of possession of an illegal firearm pursuant to a Missouri statute which empowers local authorities to hold an individual believed to be connected with a felony for twenty hours pending investigation.

Robert Clemons and appellant were advised of their *Miranda* rights, after which the officers conducted a complete search of the motel room. All seizures and searches produced a .25 caliber automatic weapon, a .32 caliber pistol, the sawed–off shotgun, and some narcotics paraphernalia including several needles and several packets of an unknown white powdery substance. At no time was a warrant procured for the purpose of searching the motel room. Except for the packets, the seized evidence was admitted over appellant's objection at the conclusion of the hearing on her motion to suppress and again at trial.

The thrust of appellant's contention is that the instant search and seizure were patently illegal because the officers never obtained a warrant and, further, that the State did not meet the burden of showing that the search was justified pursuant to one of the several exceptions to the rule requiring a search warrant. The State responds that "the officers were voluntarily admitted into the room," and that the subsequent discovery of the weapons resulted from appellant's movements toward the open suitcase and the subsequent "protective" search. We do not agree.

■ It is true that an anonymous telephone call, such as the one in the case before us, will provide sufficient justification for police officers to initiate an investigation, e. g., *Mann v. State*, 525 S.W.2d 174 (Tex.Cr.App. 1975); *George v. State*, 509 S.W.2d 347 (Tex.Cr.App. 1974); but such a "tip" will not justify a warrantless arrest or search. *Hampton v. State*, 511 S.W.2d 1 (Tex.Cr.App. 1974); *Kaser v. State*, 505 S.W.2d 806 (Tex.Cr.App. 1974).

While the odor of burning opium that led narcotics officers to Room 1 of the Europe Hotel in *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) was stronger cause than the tip and complaint motivating Officer Rider and his group, the scene at the door followed a remarkably similar scenario, quoted in full in the margin,[6] which preceded the search of that hotel room. The late Mr. Justice Jackson[7] writing for the Court, after pointing out

---

**6.** "The odor led to Room 1. The officers did not know who was occupying that room. They knocked and a voice inside asked who was there. 'Lieutenant Belland,' was the reply. There was a slight delay, some 'shuffling or noise' in the room and the defendant opened the door. The officer said, 'I want to talk to you a little bit.' She then, as he described it, 'stepped back acquiescently and admitted us.' He said, 'I want to talk to you about this opium smell in the room here.' She denied there was such a smell."

**7.** This former Attorney General of the United States was also Chief of Counsel serving the Nuremberg war crimes mission. In this same case Mr. Justice Jackson penned the now familiar dictum: "The point of the Fourth Amendment, which is often overlooked by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. * * * When the right of privacy must reasonably yield to the right to search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent."

the facts, set forth in full provisions of the Fourth Amendment and then declared:

"Entry to defendant's living quarters, which was the beginning of the search, was demanded under color of office. It was granted in submission to authority rather than an understanding and intentional waiver of a constitutional right."

■ It is well settled that when the State seeks to rely upon consent to justify the lawfulness of an entry and search or seizure, it bears the burden of proving by clear and convincing evidence that consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *Doescher v. State,* 578 S.W.2d 385 (Tex.Cr.App. 1978); *Ferguson v. State,* 573 S.W.2d 516 (Tex.Cr. App. 1978); *Kolb v. State,* 532 S.W.2d 87 (Tex.Cr.App. 1976). The State may not discharge this burden by showing no more than acquiescence to a claim of lawful authority. *Bumper v. North Carolina,* supra; *Doescher v. State,* supra; *Ferguson v. State,* supra; *Kolb v. State,* supra.

■ Our recent disposition of *Green v. State,* 594 S.W.2d 72 (Tex.Cr.App. 1980) is instructive in this vein. There the arresting officers knocked on the defendants' motel room door in the early morning hours, identified themselves and, with a key furnished by the motel manager, opened the door. The officers however, found the door chained from the inside and, after a moment or so, the defendants unlatched the door and told the officer to "Come on in." This Court concluded that the defendants did not effectively consent to entry by the officers but merely submitted to their claim of lawful authority. *Id.* at 74. See also *Kolb v. State,* supra.

We believe that the rationale of these cases from *Johnson* through *Green* is equally compelling here, given the context in which Robert Clemons admitted the officers to the motel room. The trial court, therefore, erred in failing to grant appellant's motion to suppress the evidence seized as a result of the unlawful entry.

■ Anticipating our holding, the State advances the contention that admitting this evidence was harmless error in view of the positive eyewitness identification by complainant of appellant during the commission of this offense. The test for harmless constitutional error is not whether a conviction could have been had without the improperly admitted evidence, but whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. See *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Though we are persuaded that the improperly admitted evidence did not contribute to the *conviction* of appellant for the offense of aggravated robbery, or inquiry does not end there.

■ A secondary determination must be made as to whether the admission of this evidence was harmless with respect to the eventual assessment of punishment, in this case, twenty–five years. See *Jordan v. State,* 576 S.W.2d 825, 830 (Tex.Cr.App. 1978). Appellant had not been convicted of any criminal offense at the time of this trial, a fact alluded to by the prosecutor during his argument at the punishment stage of the proceedings. But he highlighted the error in admitting the illegally obtained evidence as reflected in the following final argument:

"We've got a woman. That may influence you. She doesn't have any prior final convictions. That may influence you. She didn't cooperate with the police like he wants to say. *She was backing up towards that suitcase with this same .38 with four bullets in it. That's how she cooperated.* And why didn't she hop up and answer the door with a gun? Robert's unarmed. Robert's the mean guy, but he answers the door unarmed, doesn't he. *And those guns are all over near her.* "She isn't mean. *They had four revolvers and a shotgun. They aren't dangerous.* Handguns are to protect the individual. It's not against the law in Kansas City. *They needed four.* They didn't know who was going to come and get them.

"Situations like that show that she is not the nun that he wants you to believe she is and never has been . . ."

Under the facts of this case the 25 year sentence assessed by the jury in this cause is not unusual, but that is not the question presented here. The question is whether or not we can say that this evidence was harmless beyond a reasonable doubt given the number of years assessed by the jury. Our conclusion is buttressed by the prosecutor's request to the jury to consider this inadmissible evidence in assessing punishment, cf. *Jordan v. State*, supra, as well as what seems to us to have been the probable impact of the erroneously admitted evidence on the minds of an average jury during the punishment phase of the trial. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Indeed, we believe that the State's case during the punishment phase of the trial could have been "significantly less persuasive" had the evidence been excluded. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

Because there is a reasonable possibility that the improperly admitted evidence contributed to the number of years assessed by the jury as punishment, *Schneble v. Florida*, supra, we find that the error in admitting the evidence alluded to above was not harmless beyond a reasonable doubt.

The judgment is reversed and the cause remanded.