Opinion Issued February 10, 2005



















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00092-CR
____________

LILLIAN BROOKS, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 228th District Court
Harris County, Texas
Trial Court Cause No. 947563
 

 
 
MEMORANDUM OPINION
          The trial court found appellant, Lillian Brooks, guilty of the offense of
possession with the intent to deliver a controlled substance, namely crack cocaine
weighing more than four but less than 200 grams,


 and assessed her punishment at
confinement for five years. In seven points of error, appellant contends that the trial
court erred in denying her motion to suppress evidence, that the evidence was legally
insufficient to support her conviction, that the trial court erred in admitting evidence
for which the State had failed to establish a proper chain of custody, and that the trial
court erred in qualifying a sheriff’s deputy as an expert witness. We affirm.
Facts
          Harris County Sheriff’s Deputy E. Clegg, assigned to a “Hot Spot” division
comprised of narcotics officers investigating street-level narcotics sales, testified that,
on May 1, 2003, he received a “tip” from a confidential informant. The informant,
a person whom Clegg had arrested a few days earlier, told Clegg that crack cocaine
was being sold at a house in an area described by Clegg as where “heavy, heavy crack
sales” occur. Clegg and other deputies drove to the residence in marked patrol cars
to conduct a “knock and talk.” 
          When Clegg arrived at the residence, he saw a lot of people going into and
coming out of the residence. Clegg approached a man, who identified himself as
Melvin Smith, appellant’s father, sitting in the driveway. Clegg told Melvin “what
[the deputies] were doing there,” and, because of the heavy amount of foot traffic
going into and coming out of the residence, Clegg asked if the deputies could conduct
a “protective sweep” to remove anyone inside. Melvin gave his permission. During
the “protective sweep,” Clegg saw numerous weapons and narcotics inside the
residence. Specifically, in the northwest bedroom, which he later learned was
appellant’s bedroom, he saw what appeared to be a crack “rock” on top of a
television, and, laying on the bed, he saw what appeared to be a crack “cookie,” a pill
bottle and a clear plastic bag containing crack cocaine, an open metal box, and
papers.


 Clegg then left the residence, approached Melvin again, explained to him
in more detail the information and allegations the deputies had received, and asked
Melvin if he would be willing to sign a consent-to-search form to allow the deputies
to search the residence. In response, Melvin directed Clegg to Melvin’s wife and
appellant’s mother, Dorothy Smith, who was also standing outside in the driveway. 
          After explaining the narcotics complaint to Dorothy, Clegg asked her for
consent to search the residence and presented her with a consent-to-search form. 
Clegg testified that Dorothy seemed to fully understand what was happening, that she
signed the form, and that he did not force her to sign the form. The State offered, and
the trial court admitted, the consent-to-search form into evidence without objection
from appellant. After Dorothy signed the form, Clegg and other deputies searched
the house. From the northwest bedroom, Clegg retrieved the crack “rock” from on
top of the television, and retrieved the crack “cookie,” the pill bottle and clear plastic
bag containing crack cocaine, multiple checkbooks printed in appellant’s name, and
a bank statement printed in the name of appellant’s brother and co-defendant, Charles
Smith, from the bed.


 Clegg also found appellant’s work identification, bearing her
picture, “on the scene.” 
          After completing the search, Clegg went back outside and spoke with
appellant, who explained that she, her son, and her nephew lived in the house, along
with Melvin and Dorothy. She also told Clegg where her bedroom was located within
the house and that her bedroom was one of the two rooms in which he had found
crack cocaine. Appellant also told him that she was holding the cocaine for her
brother, Charles. After the State showed Clegg the crack “rock” found on top of the
television, the pill bottle and clear plastic bag containing crack cocaine, and the now-broken crack “cookie,” Clegg identified such items as coming from appellant’s
bedroom. Furthermore, based on his training and experience, Clegg determined that,
considering the amount of crack cocaine found at the residence, the cocaine was not
“for personal consumption” but for sale. 
          On cross-examination, Deputy Clegg testified that he had not yet formed an
opinion as to whether the confidential informant was credible and reliable. However,
to corroborate the informant’s complaint, Clegg ran a criminal history on the name
that the informant had given him. When Clegg arrived at the residence, he did not see
any crimes being committed, and he did not “determine [Dorothy Smith] to be a
nervous woman.”
          Harris County Sheriff’s Deputy D. Houston testified that, during the
“protective sweep,” he entered only the southwest bedroom, where he saw weapons
on top of a speaker. He then returned outside to watch the people that were in the
yard, and he did not re-enter the house. On cross-examination, he testified that he
believed Melvin and Dorothy Smith gave the deputies permission to enter their
residence, but he did not witness any consents to search. Harris County Sheriff’s
Deputy W. Jones testified that Charles Smith, appellant’s brother and co-defendant,
told him that “the crack, the cocaine or whatever that was found was his inside the
residence.”
          Richele Howelton, a forensics chemist for the Harris County Medical
Examiner’s office, testified that, after she analyzed the substances, she determined
that the “rock” found on top of the television was cocaine in the amount of 0.11
grams, the “rock” in the pill bottle was cocaine in the amount of 15.42 grams, the
now-broken “cookie” was cocaine in the amount of 22.67 grams, and the “rocks”
from the clear plastic bag were cocaine in the amount of 0.88 grams.
          In her defense, appellant presented the testimony of Melvin Smith, who stated
that, when the deputies arrived at his residence, they did not approach him but went
straight inside the residence without permission. After the deputies left the house,
they conducted a pat-down search of his person, called him an “old smartass,” and
asked him to sign a “search warrant” to enter the house, but Melvin refused. The
deputies then approached Dorothy and told her that Melvin had told her to sign the
form and that, if she did not sign, then the deputies would take away her house. He
explained that he did not tell them to have Dorothy sign the form, that he did not
know Dorothy had actually signed the form until after the fact, and that he had not
seen the deputies make her sign the form. 
          Dorothy Smith testified that she was in her room when a deputy walked into
the house and told her to go outside. Although she identified her signature on the
consent-to-search form that had been admitted into evidence, she explained that she
signed the form only because a deputy told her that “they were going to take [her]
home” if she refused. She further stated that the deputy did not tell her that Melvin
had told her to sign the form. Additionally, although she testified during cross-examination that she did not remember signing the affidavit dated August 19, 2003,
that supported appellant’s motion to suppress, she later indicated on redirect
examination that she understood what she had signed. Joyce McCormick, a notary,
testified that Dorothy signed the affidavit in her presence. 
          Appellant testified that she was in her bedroom when a deputy, who had
entered the residence, told her that she needed to go outside. While outside, she saw
deputies speaking to Melvin, but she was not able to hear their conversation. 
However, she heard Melvin say “no.” She also saw a deputy try to make Dorothy
sign papers, but appellant told them that Dorothy was not able to sign papers because
she had suffered a stroke in the past, and appellant did not see Dorothy actually sign
the consent form. A deputy then took appellant to a patrol car because he told her
that he had found narcotics in her bedroom, a room that appellant had told deputies
belonged to her. However, she denied making any statement that the narcotics found
in her bedroom belonged to her brother, Charles. She explained that the bank
statement bearing Charles’s name that had been admitted into evidence was hers but
that she had kept them in a dresser drawer. She also explained that the deputies had
apparently dumped her prescription medication onto her bed. Furthermore, she noted
that she usually kept her checkbooks in a safe


 that was stored in her computer desk,
and she had not left the safe on the bed the night the deputies entered the residence. 
Finally, she did not know that any crack “rocks” were inside her safe and did not
know who put them inside the safe. Motion to Suppress Evidence
          In points of error one through four, appellant contends that the trial court erred
in denying her pre-trial motion to suppress the evidence found during the search of
her parents’ residence because (1) the State did not “prove beyond a reasonable doubt
that consent was given freely and voluntarily”; (2) the informant’s tip did not justify
“an investigative search of the resident”; (3) the deputies unlawfully entered the
residence; and (4) the State did not establish, with clear and convincing evidence, that
Dorothy Smith freely and voluntarily consented to the search of the residence.

Waiver

          We note, initially, that the State argues that appellant waived any review of the
trial court’s pre-trial suppression ruling because appellant failed to object to
significant testimony concerning the crack cocaine during the trial.
          When a pre-trial motion to suppress evidence is overruled, the defendant need
not subsequently object at trial to the same evidence in order to preserve error on
appeal. Moraguez v. State, 701 S.W.2d 902, 904 (Tex. App. Crim. 1986). However,
when a defendant affirmatively states that she has “no objection” at trial to the
admission of the complained-of evidence, she waives any error in the admission of
the evidence, despite the pretrial ruling. Moody v. State, 827 S.W.2d 875, 889 (Tex.
Crim. App. 1992). The State argues that a “defendant may still waive error in
admitting drug evidence by failing to object to the testimony of officers at trial with
regard to the defendant’s arrest and items found in their search.” In support of its
argument, the State relies on Marini v. State, 593 S.W.2d 709 (Tex. Crim. App.
1980); Thomas v. State, 884 S.W.2d 215 (Tex. App.—El Paso 1994, pet. ref’d); and
Turner v. State, 642 S.W.2d 216 (Tex. App.—Houston [14th Dist.] 1982, no pet.).
          The record indicates that appellant did not affirmatively state that she had “no
objection” to the admission of the crack cocaine found in her bedroom, but it also
shows that appellant did not object when Deputy Clegg testified that he found crack
cocaine in appellant’s bedroom. However, the cases cited by the State do not fully
support its proposition. In Marini, the court held that the defendant did not preserve
error because he failed to timely object to an officer’s testimony regarding narcotics,
and, in a footnote, the court expressly stated that the defendant’s motion to suppress
his oral confession did not embrace the admission of the evidence to which the
defendant was objecting at trial. 593 S.W.2d at 714. In Thomas, the defendant did
not obtain a hearing or a ruling on his motion to suppress evidence, so the defendant
was required to object to the evidence at the earliest opportunity to preserve error. 
884 S.W.2d at 216-17. In Turner, the defendant did not preserve error because he
had not filed a motion to suppress evidence and did not object until after the officer
testified about the arrest and subsequent search. 642 S.W.2d at 217. Finally, here,
appellant secured an adverse ruling on her pre-trial motion to suppress, and she did
not have to object at trial. See Moraguez, 701 S.W.2d at 904. Accordingly, we hold
that appellant has preserved error for our review of the trial court’s denial of her
motion to suppress evidence, and we address points of error one through four. 
Standard of Review 
          The appropriate standard for reviewing a trial court’s ruling on a motion to
suppress evidence is bifurcated, giving almost total deference to a trial court’s
determination of historical facts and reviewing de novo the court’s application of the
law. Maxwell v. State, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). In reviewing a
ruling on a question of the application of law to facts, we review the evidence in the
light most favorable to the trial court’s ruling. Guzman v. State, 955 S.W.2d 85, 89
(Tex. Crim. App. 1997). However, we review de novo a trial court’s determination
of reasonable suspicion and probable cause. Id. at 87. At a suppression hearing, the
trial court is the sole and exclusive trier of fact and judge of the witnesses’ credibility. 
Maxwell, 73 S.W.3d at 281. Accordingly, the trial court may choose to believe or to
disbelieve all or any part of a witness’s testimony. State v. Ross, 32 S.W.3d 853. 855
(Tex. Crim. App. 2000). 
          Here, the trial court denied appellant’s pre-trial motion to suppress evidence
based on affidavits and without stating the basis for its order. The parties did not
request, and the trial court did not make, findings of fact and conclusions of law. 
When a trial court does not file findings of fact, we view the evidence in the light most
favorable to the trial court’s ruling and assume that the trial court made implicit
findings of fact that support its ruling as long as those findings are supported by the
record. Id. In determining whether a trial court’s decision is supported by the record,
we generally consider only evidence adduced at the suppression hearing because the
ruling was based on it rather than evidence introduced later. Rachal v. State, 917
S.W.2d 799, 809 (Tex. Crim. App. 1996). However, this general rule is inapplicable
where the suppression issue has been consensually re-litigated by the parties during
the trial on the merits. Id. Where the State raises the issue at trial without objection
or with subsequent participation on the inquiry by the defense, the defendant has made
an election to re-open evidence, and consideration of the relevant trial testimony is
appropriate in our review. Id. In the case at bar, because appellant did not object
when the State reintroduced the suppression issues and, indeed, fully participated in
the re-litigation of the issue in appellant’s cross-examination of Deputy Clegg and in
her direct examination of her own witnesses, we may properly consider the witnesses’
trial testimony in our review of the trial court’s suppression determination.



Consent to Search
          In her first and fourth points of error, appellant asserts that the trial court
committed reversible error in denying appellant’s motion to suppress evidence of
“contraband” found in the residence because the State did not present evidence “to
prove beyond a reasonable doubt that consent was given freely and voluntarily.” In
part of appellant’s third point of error, appellant argues that the deputies entered her
house “without the consent of its residents” and that “they observed no crime being
committed.”
          Under the Fourth


 and Fourteenth


 Amendments to the United States
Constitution, a search conducted without a warrant issued upon probable cause is per
se unreasonable, limited to a few well-delineated exceptions. Schneckloth v.
Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973); Reasor v. State, 12
S.W.3d 813, 817 (Tex. Crim. App. 2000). A search pursuant to voluntary consent is
an exception to the requirement that a search be based upon a warrant supported by
probable cause. Reasor, 12 S.W.3d at 817. Consent can be given by the individual
whose property is searched or by a third party who possesses common authority over
the premises. Illinois v. Rodriguez, 497 U.S. 177, 179-81, 110 S. Ct. 2793, 2796-97
(1990); State v. Derrow, 981 S.W.2d 776, 778 (Tex. App.—Houston [1st Dist.] 1998,
pet. ref’d). A third party properly consents to a search when he has control over and
authority to use the premises being searched. United States v. Matlock, 415 U.S. 164,
171, 94 S. Ct. 988, 993 (1974); Garcia v. State, 887 S.W.2d 846, 851 (Tex. Crim. App.
1994); Derrow, 981 S.W.2d at 778.


 For consent to be valid, however, it must be
voluntary. Reasor, 12 S.W.3d at 817-18. 
          The validity of an alleged consent to search is a question of fact to be
determined from the totality of the circumstances. Maxwell, 73 S.W.3d at 281. 
Among the factors to be considered in determining voluntariness include the youth,
intelligence, or education of the person, the constitutional advice given to the person,
the length of the detention, the repetitiveness of the questioning, and the use of
physical punishment. Reasor, 12 S.W.3d at 818. The United States Constitution
requires the State to prove the voluntariness of consent by a preponderance of the
evidence, while the Texas Constitution requires the State to show by clear and
convincing evidence that the consent was freely and voluntarily given. Maxwell, 73
S.W.3d at 281. Neither the United States Constitution nor the Texas Constitution
requires the State to show that consent was freely and voluntarily given beyond a
reasonable doubt. See id.
          In his affidavit considered at the suppression hearing, Deputy Clegg stated that
he and other deputies went to the residence pursuant to a tip that narcotics activity
took place at the residence. When he arrived at the residence, he spoke to Melvin
Smith, who was seated outside on a chair in the driveway. Melvin told Clegg that he
and his wife, Dorothy, owned the house. After explaining to Melvin that the deputies
were investigating a narcotics complaint, Clegg asked Melvin if Clegg could enter the
house and vacate anyone inside, and, Melvin replied that Clegg could do so. When
Clegg entered the residence, he saw a “crack rock on top of a television and an open
box containing what appeared to be a crack ‘cookie’ in the northwest bedroom.” 
Clegg then returned to Melvin and asked permission to search the residence, to which
Melvin replied, “Go ahead.” Clegg then asked Dorothy Smith if he could search the
residence, and she also told Clegg that he could conduct the search. Clegg gave
Dorothy a voluntary consent-to-search form, which she signed. Clegg stated that he
did not threaten or intimidate either Melvin or Dorothy at any time. Dorothy also told
Clegg that appellant, her adult son, and her grandsons lived with her. Clegg re-entered
the residence and found various containers of cocaine throughout the residence. 
          At trial, Deputy Clegg’s testimony pertaining to Dorothy Smith’s consent was
essentially consistent with his affidavit, except that, at trial, he testified that when he
asked Melvin for consent to search after Clegg had performed the “protective sweep,”
Melvin directed him to Dorothy. Additionally, at trial, Clegg testified that Dorothy
seemed to fully understand what was happening when she signed the consent-to-search form and that he did not force Dorothy to sign the form.  
          In her affidavit, Dorothy Smith stated that, an officer, who told her that he was
looking for Charles Smith, walked into her bedroom and told her and appellant to go
outside, where officers detained her, Melvin, her children, and grandchildren. Even
though her children inquired about a search warrant, the officers entered the residence
without a warrant, and, after the officers removed two safes from the house, they pried
open the safes and found “dope.” Officers then approached her and told her that
Melvin had told her to sign the paper. She explained that, even though Melvin is her
legal guardian due to a stroke that she had suffered, she signed the paper because the
officers threatened to take her to jail and take away her home. 
          In his affidavit, Melvin Smith stated that, after about 10 officers entered his
property, two officers searched him and requested that he sign a consent-to-search
form, but Melvin refused. He saw officers present the form to Dorothy, but he did not
hear their conversation with her. He denied that he told the officers to tell her to sign
the form. He also stated that Dorothy Smith was very confused at the time.
          The additional affidavits from appellant and her other witnesses all essentially
provided similar information, stating that the deputies did not ask permission to enter
the residence and that the witnesses saw a deputy present a paper to Dorothy, heard
him say that Melvin had told her to sign the paper, and heard him threaten to send
Dorothy to jail and take away the house, causing Dorothy to sign the form. At trial,
the testimony of appellant and her witnesses was substantially consistent with their
affidavits considered at the pretrial suppression hearing. 
          Here, the record supports a finding by clear and convincing evidence that the
consent to search the residence was freely and voluntarily given. The record indicates
that, after arriving at the residence and explaining to Melvin Smith that the deputies
were investigating a narcotics complaint, Deputy Clegg asked Melvin Smith if the
deputies could conduct a “protective sweep” of the house, and Melvin Smith gave his
permission to do so. After performing the “protective sweep” and seeing narcotics and
weapons in plain view inside the residence, Clegg’s affidavit states that when Clegg
asked Melvin Smith whether the deputies could search the residence, Melvin said, “Go
ahead.” Furthermore, Clegg gave Dorothy a voluntary consent-to-search form, which
she signed. In his affidavit, Clegg stated that he did not threaten or intimidate either
Melvin or Dorothy Smith at any time. At trial, Clegg testified that he did not force
Dorothy Smith to sign the form. Testimony by law enforcement officers that no
coercion was involved in obtaining the consent is evidence of the consent’s voluntary
nature. Martinez v. State, 17 S.W.3d 677, 683 (Tex. Crim. App. 2000). Appellant and
her witnesses gave statements in their affidavits and at trial that were contrary to the
deputies’ statements, but the trial court, as the fact finder, was free to disbelieve
appellant and her witnesses. Id. Giving deference to the trial court’s resolution of
factual conflicts, we conclude that there was clear and convincing evidence to sustain
the trial court’s ruling that Dorothy Smith freely and voluntarily consented to the
search of her residence. Thus, we hold that the trial court did not err in denying
appellant’s motion to suppress evidence seized from the residence on the grounds that
the consent to search the residence was involuntary. 
Exceptions to the Warrant Requirement
           In part of her third point of error, appellant also argues that the State did not
present evidence to prove that exigent circumstances or other exceptions to the
warrant and probable cause requirements existed. However, as noted, one of the well-established exceptions to the warrant and probable cause requirements of the Fourth
Amendment is a search conducted pursuant to consent. Spight v. State, 76 S.W.3d
761, 768 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Voluntary consent to a
warrantless search violates neither the United States or Texas Constitutions, nor the
laws of Texas. Brimage v. State, 918 S.W.2d 466, 480 (Tex. Crim. App. 1994);
Spight, 76 S.W.3d at 768. Here, because, as noted, the record supports the implied
finding that Dorothy Smith’s consent was given freely and voluntarily, the State was
not required to prove that exigent circumstances and probable cause existed or other
exceptions existed to excuse the absence of a search warrant. Thus, we hold that the
trial court did not err in denying appellant’s motion to suppress evidence seized from
the residence on the grounds that no exception to the warrant requirement existed. 
“Anonymous Tip” and “Investigative Detention”
          In her second point of error, appellant argues that the deputies lacked reasonable
suspicion to “justify an investigative search of the resident” because (1) “[t]he
anonymous tip did not exhibit sufficient indicia of reliability”; (2) “the deputies went
to the residence on a ‘mere hunch and suspicion’ and nothing more”; and (3) “the
anonymous tip was never corroborated or verified.” 
          A peace officer may make a temporary investigative detention of an individual
if the officer has a reasonable suspicion that some activity out of the ordinary is or has
occurred, some suggestion to connect the detainee with the unusual activity, and some
indication that the activity is related to a crime. Garza v. State, 771 S.W.2d 549, 558
(Tex. Crim. App. 1989); Guevara v. State, 6 S.W.3d 759, 763 (Tex. App.—Houston
[1st Dist.] 1999, pet. ref’d). As appellant notes, an anonymous tip usually will justify
the initiation of a police investigation. Clemons v. State, 605 S.W.2d 567, 570 (Tex.
Crim. App. 1980); Mann v. State, 525 S.W.2d 174, 176 (Tex. Crim. App. 1975). 
However, an anonymous tip alone will not generally establish the level of suspicion
required to justify a detention. Florida v. J. L., 529 U.S. 266, 270, 120 S. Ct. 1375,
1378 (2000); Guevara, 6 S.W.3d at 763.
          Here, although information from a confidential informant initiated the deputies’
investigation, the search of the house was conducted pursuant to a voluntary consent
to search. Because the record supports the implied finding that Clegg received
voluntary consent from Dorothy Smith to search the house, Clegg did not need either
reasonable suspicion or probable cause to, in appellant’s words, “justify an
investigative search of the resident.” Again, constitutional proscriptions against
warrantless searches and seizures do not come into play when a person gives free and
voluntary consent to a search. Derrow, 981 S.W.2d at 778. Accordingly, we hold that
the trial court did not err in denying appellant’s motion to suppress evidence seized
from the residence on the grounds that the “anonymous tip did not exhibit sufficient
indicia of reliability to justify the search of the resident.” 
          We overrule points of error one through four.
Legal Sufficiency
          In her fifth point of error, appellant argues that the evidence was legally
insufficient to support her conviction because the State failed to affirmatively link
appellant to the “contraband” found in the residence. Appellant notes that (1) during
cross-examination, “Deputy Houston testified that when he entered the northwest
bedroom, he saw no contraband on [a]ppellant’s bed or anywhere in the rooms he had
gone through”; (2) “[t]he only evidence that the State presented to affirmatively link
[a]ppellant to the contraband was items indicating [a]ppellant occupied the room”; and
(3) appellant denied “making the statement that the drugs belonged to anyone else.”
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine if any rational fact finder could have
found the essential elements of the offense beyond a reasonable doubt. King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In a legal sufficiency review, we may
not substitute our own judgment for that of the fact finder. Id.
          A person commits an offense if she intentionally or knowingly possesses with
intent to deliver cocaine in an amount weighing more than four grams and less than
200 grams by aggregate weight, including any adulterants or dilutants. Tex. Health
& Safety Code Ann. § 481.102(3)(D) (Vernon Supp. 2004-2005), § 481.112(a), (d)
(Vernon 2003). 
          To establish unlawful possession with the intent to deliver a controlled
substance, the State must show that a defendant (1) exercised care, custody, control,
or management over the controlled substance; (2) knew that she possessed a controlled
substance; and (3) had the intent to deliver the controlled substance. See id.
§ 481.002(38) (Vernon Supp. 2004-2005), § 481.112(a) (Vernon 2003); see Brown v.
State, 911 S.W.2d 744, 746-48 (Tex. Crim. App. 1995). “‘Deliver’ means to transfer,
actually or constructively, to another a controlled substance” and includes offering to
sell a controlled substance. Tex. Health & Safety Code Ann. § 481.002(8)
(Vernon Supp. 2004-2005). The State may prove that a defendant knowingly
possessed contraband by offering circumstantial evidence affirmatively linking her to
the contraband. Brown, 911 S.W.2d at 747. The State need not show that the
defendant exercised exclusive control over the controlled substance, but, when the
defendant does not have exclusive control, the State must show additional affirmative
links between the defendant and the contraband. Cedano v. State, 24 S.W.3d 406, 411
(Tex. App.—Houston [1st Dist.] 2000, no pet.). The affirmative links must raise a
reasonable inference that the defendant knew of and controlled the contraband. 
Dickerson v. State, 866 S.W.2d 696, 700 (Tex. App.—Houston [1st Dist.] 1993, pet.
ref’d).          
          Factors that may be considered to establish affirmative links include (1) the
defendant’s presence when the search was executed; (2) whether the narcotics were
in plain view; (3) the defendant’s proximity to and accessibility of the narcotics;
(4) whether the defendant was under the influence of narcotics when arrested; (5) the
defendant’s possession of other narcotics when arrested; (6) the defendant’s
incriminating statements; (7) the defendant’s attempted flight; (8) the defendant’s
furtive gestures; (9) the presence of an odor of the narcotics; (10) the presence of other
narcotics or narcotics paraphernalia; (11) the defendant’s ownership or right to
possession of the place where narcotics were found; and (12) whether the narcotics
were found in an enclosed place. Williams v. State, 859 S.W.2d 99, 101 (Tex.
App.—Houston [1st Dist.] 1993, pet. ref’d). Despite this list of factors, there is no set
formula necessitating a finding of an affirmative link; rather, affirmative links are
established by the totality of the circumstances. Sosa v. State, 845 S.W.2d 479, 483
(Tex. App.—Houston [1st Dist.] 1993, pet. ref’d). 
          Deputy Clegg testified that, in the northwest bedroom, he found a crack “rock”
on top of a television in plain view, and, on the bed, also in plain view, he found a
crack “cookie” and a pill bottle and a clear plastic bag both containing crack cocaine. 
Clegg testified that appellant told him which bedroom in the house belonged to her
and that her room was one of the two rooms in which he found crack cocaine. 
Furthermore, Clegg testified that, on appellant’s bed, multiple checkbooks printed in
appellant’s name were also laying next to the crack cocaine. Finally, Clegg testified
that appellant told him that she was holding the cocaine for her brother, Charles.
          Considering this evidence, a rational fact finder could have found, beyond a
reasonable doubt, that the appellant knew of and controlled the “contraband” found
in her bedroom by Deputy Clegg. We hold that the evidence was legally sufficient to
support appellant’s conviction for possession of a controlled substance with intent to
deliver.
          We overrule appellant’s fifth point of error.
Chain of Custody
          In her sixth point of error, appellant argues that the trial court erred in admitting
the cocaine into evidence because the State failed to establish a proper chain of
custody. Specifically, appellant contends that the chain of custody was not properly
established because (1) Deputy Clegg failed to testify about the condition of the
cocaine and how the cocaine was forwarded to the medical examiner’s office and
(2) the State failed to call as a witness the person who actually received the evidence
from Clegg to testify about the condition of the cocaine upon receipt. 
          It is within the trial judge’s discretion to determine the sufficiency of a
predicate, and, absent an abuse of discretion, we will not disturb that finding. Smith
v. State, 683 S.W.2d 393, 405 (Tex. Crim. App. 1984); Foster v. State, 101 S.W.3d
490, 498 (Tex. App.—Houston [1st Dist.] 2002, no pet.). If a substance is properly
identified, most questions concerning care and custody go to the weight of the
evidence, not to its admissibility, unless there is a showing that the substance was
tampered with or changed. Foster, 101 S.W.3d at 498. When the State shows the
beginning and the ending of the chain of custody, any gaps in between go to weight
rather than the admissibility of the evidence, particularly if the chain of custody from
seizure to the laboratory is shown. Id. 
          Deputy Clegg testified that he placed the cocaine that he had found in
appellant’s bedroom into individual bags, sealed the bags, and placed an offense report
number on each of the bags. Clegg further identified State’s Exhibits 4, 5, 6-A, and
6-B


 as the narcotics that he found in appellant’s bedroom and testified that the
exhibits did not appear to have been tampered with in any way. Richele Howelton
testified that the packages containing State’s Exhibits 4, 5, 6-A, and 6-B bore the
offense report number from appellant’s case, that the packages were hand-delivered
in a sealed condition to the laboratory, and that, based on her personal knowledge,
former chemist, Charles Gould, would have placed the packages into a locked
evidence vault. Howelton also testified that the four exhibits contained the substances
that she analyzed. 
          In this case, the State showed a complete chain of custody from seizure to the
laboratory. Because the record reveals no evidence of tampering, any gaps caused by
Clegg’s or Howelton’s testimony went to the weight of the evidence, not its
admissibility. Thus, we hold that the trial court did not abuse its discretion in
admitting the cocaine into evidence on the grounds that the State failed to establish a
proper chain of custody.
          We overrule appellant’s sixth point of error.
Failure to Qualify a Witness as an Expert 
          In her seventh point of error, appellant argues that the trial court erred in
allowing Deputy Clegg to testify as an expert because the State did not properly
qualify Clegg as an expert. At trial, during the State’s direct examination of Clegg,
the trial court allowed counsel for appellant’s co-defendant to question Clegg as to his
experience and training in determining whether the cocaine found in appellant’s
bedroom was “for personal consumption,” as opposed to being for sale. During the
questioning, counsel for the co-defendant stated, “I would just object to any of his
questions as being an expert insofar as it’s not predicated at this time.” The trial court
did not rule on the objection but, instead, allowed the State to proceed with laying the
predicate to qualify Clegg as an expert witness. However, counsel for appellant did
not object to Clegg’s expert testimony at any time. 
          A co-defendant may adopt the objection of her fellow defendant, but that
adoption must be reflected in the record. Woerner v. State, 576 S.W.2d 85, 86 (Tex.
Crim. App. 1979). A co-defendant who does not voice her own objection at trial has
not preserved error. See Lerma v. State, 679 S.W.2d 488, 498 (Tex. Crim. App. 1982). 
In the absence of any agreement that one counsel’s objection would automatically
apply to all counsel, it was incumbent on counsel for appellant to make a separate
objection on behalf of appellant. Here, even assuming that counsel for the co-defendant made a proper objection and received a ruling, counsel for appellant failed
to make a separate objection, and there is no evidence in the record that any agreement
existed that one counsel’s objections would automatically apply to both counsel. 
Therefore, appellant has waived her right to complain about the admission of Clegg’s
expert testimony concerning whether the cocaine found in appellant’s bedroom was
“for personal consumption.”
          We overrule appellant’s seventh point of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Nuchia, Jennings, and Alcala.
 
Do not publish. Tex. R. App. P. 47.2(b).